**No. 22-13258-J**

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

————————————

KEITH SYLVESTER,

*Plaintiff/Appellant*,

v.

JAMES BARNETT

*Defendant/Appellee.*

————————————

Appeal From The United States District Court
For The Northern District Of Georgia
Case No. 1:19-CV-4300-LMM

————————————

**APPELLANT KEITH SYLVESTER'S BRIEF**

————————————

ZACK GREENAMYRE
Georgia Bar No. 293002
MITCHELL & SHAPIRO LLP
3490 Piedmont Road, Suite 650
Atlanta, Georgia 30305
404.812.4747
zack@michtellshapiro.com

December 22, 2022

*Sylvester v. Barnett*
22-13258-J

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1, the following is a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held company that owns 10% or more of the party's stock, and any other identifiable legal entities related to a party:

1.    Barnett, James (Defendant/Appellee);

2.    City of Atlanta (employer of Defendant/Appellee);

3.    Darrin Smith (Defendant);

4.    Funt, Samantha (counsel for Plaintiff/Appellant);

5.    Greenamyre, Zack (counsel for Plaintiff/Appellant);

6.    Miller, Staci J. (counsel for Defendant/Appellee);

7.    Mitchell & Shapiro LLP (law firm for counsel for Plaintiff/Appellant);

8.    Pierre, Hermise (counsel for Defendant/Appellee);

9.    Sylvester, Keith (Plaintiff/Appellant);

10.    The Honorable John J. Larkins (United States Magistrate Judge); and

11.    The Honorable Leigh Martin May (United States District Judge).

*Sylvester v. Barnett*
22-13258-J

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

This 22nd day of December, 2022.

**<u>Zack Greenamyre</u>**
Zack Greenamyre
Georgia Bar No. 293002

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant requests oral argument.

As to the facts, there are a lot of them. Defendant points to many independently perhaps innocuous facts that he contends present an inculpatory mosaic. Plaintiff highlights a select few facts that, he contends, show beyond all doubt that the claimed mosaic is not a faithful rendition of the real image. He alternatively contends that the each of individual tiles are misplaced. Colloquy with counsel will help orient the Court to the facts that matter.

As to the law, in recent years this Court has significantly elaborated the federal constitutional tort of malicious prosecution. *See Williams v. Aguirre*, 965 F.3d 1147 (11th Cir. 2020); *Laskar v. Hurd*, 972 F.3d 1278 (11th Cir. 2020); *Luke v. Gulley*, 975 F.3d 1140 (11th Cir. 2020) ("*Luke I*"); *Washington v. Howard,* 25 F.4th 891 (11th Cir. 2022); *Luke v. Gulley*, 50 F.4th 90 (11th Cir. 2022) ("*Luke II*"); *see also Thompson v. Clark*, 142 S. Ct. 1332 (2022) (favorably citing *Williams*, *Laskar*, and the Chief Judge-author of the previously cited decisions). This case presents further, significant questions about malicious prosecution claims, including how district courts must gauge conflicting facts at summary judgment surrounding information known but not disclosed to the magistrate, and the interplay of the false arrest and malicious prosecution standards in Fourth Amendment claims.

## **TABLE OF CONTENTS**

Certificate of Interested Persons and Corporate Disclosure Statement............C-1

Statement Regarding Oral Argument....................................................................i

Table of Authorities............................................................................................iv

Statement of Subject-Matter and Appellate Jurisdiction.....................................1

Statement of The Issues.......................................................................................2

Statement of The Case.........................................................................................3

    **A.**   ***Statement of Facts*** ..............................................................................3

        *1.*  Synopsis and Barnett's Theory of the Case .....................................3

        *2.*  The Basic Facts Barnett Knew Showing His Theory Was a Metaphysical Impossibility...............................................................5

        *3.*  The Warrant's Material Exculpatory Omissions and False Inculpatory Facts ..........................................................................8

        *4.*  Purportedly Inculpatory Facts Not Disclosed to the Magistrate....14

        *5.*  Cornelius Muckle Arrested and Facing Trial for the Hubbards' Deaths ...........................................................................................16

    **B.**   ***Procedural History*** .........................................................................17

Summary of the Argument .................................................................................19

Argument and Citation of Authority ..................................................................21

  **I.**  **A REASONABLE JURY COULD FIND DEFENDANT KNEW HIS THEORY OF THE CASE AS ARTICULATED TO THE MAGISTRATE WAS IMPOSSIBLE** ..................................................21

 **II.**  **THE LEGAL PROCESS WAS CONSTITUTIONALLY INFIRM BECAUSE BARNETT FAILED TO DISCLOSE MATERIAL EXCULPATORY FACTS AND PROBABLE CAUSE WAS LACKING**...............................................................................................30

    ***A. A Reasonable Jury Could Find Knowing (and Reckless) Material Omissions and Falsehoods*** .................................................................33

    ***B. Taking the Inculpatory Facts from the Warrant and the Facts Barnett Knew at the Time of the Warrant, Barnett Should Have Known His Application Failed to Establish Probable Cause*** ...............................38

**III. TAKING PLAINTIFF'S FACTS AS TRUE, BARNETT IS NOT ENTITLED TO QUALIFIED IMMUNITY**........................................42

    **A.** ***Barnett Violated* Franks *and there was no Actual Probable Cause***........................................................44

    **B.** ***Barnett Violated* Malley *and there was no Arguable Probable Cause***........................................................45

Conclusion........................................................47

Certificate of Compliance ........................................48

Certificate of Service...............................................49

# TABLE OF AUTHORITIES

## Federal Cases

*Carter v. Gore*,
   557 F. App'x 904 (11th Cir. 2014) ...................................................... 43

*Cozzi v. City of Birmingham*,
   892 F.3d 1288 (11th Cir. 2018) ....................................................... 42

*Croley v. Matson Nav. Co.*,
   434 F.2d 73 (5th Cir. 1970) ............................................................. 37

*Cty. of Riverside v. McLaughlin*,
   500 U.S. 44 (1991) ......................................................................... 31

*Daniels v. Bango*,
   487 F. App'x 532 (11th Cir. 2012) ............................................. 30, 33

*Franks v. Delaware*,
   438 U.S. 154 (1978) ............................................................... passim

*Gerstein v. Pugh*,
   420 U.S. 103 (1975) ....................................................................... 31

*Gleghorn v. Koontz*,
   178 F.2d 133 (5th Cir. 1949) ......................................................... 16

*Graham v. Connor*,
   490 U.S. 386 (1989) ....................................................................... 33

*Grider v. City of Auburn*,
   618 F.3d 1240 (11th Cir. 2010) ..................................................... 32

*Hill v. Dekalb Regional Youth Detention Ctr.*,
   40 F.3d 1176 (11th Cir. 1994) ....................................................... 44

*Holmes v. Kucynda*,
   321 F.3d 1069 (11th Cir. 2003) ................................................. 33, 44

*Hope v. Pelzer*,
    536 U.S. 730 (2002) ........................................................... 44

*Kelly v. Curtis*,
    21 F.3d 1544 (11th Cir. 1994)........................................ 29, 33, 43, 44

*Kingsland v. City of Miami*,
    382 F. 3d 1220 (11th Cir. 2004) ...................................... 28, 30, 39, 42

*Laskar v. Hurd*,
    972 F.3d 1278 (11th Cir. 2020) ...................................................... i, 31

*Lee v. Ferraro*,
    284 F.3d 1188 (11th Cir. 2002) ......................................................... 46

*Luke v. Gulley*,
    50 F.4th 90 (11th Cir. 2022) ..................................................... i, 31, 45

*Luke v. Gulley*,
    975 F.3d 1140 (11th Cir. 2020) ...................................................... i, 31

*Malley v. Briggs*,
    475 U.S. 335 (1986) .............................................................. passim

*Mosley v. Wade*,
    No. 1:19-CV-4181-CAP, 2020 WL 7051351 (N.D. Ga. Nov. 5, 2020)............. 29

*Norelus v. Denny's, Inc.*,
    628 F.3d 1270 (11th Cir. 2010) ......................................................... 32

*Paez v. Mulvey*,
    915 F.3d 1276 (11th Cir. 2019) ......................................................... 34

*Rushing v. Parker*,
    599 F.3d 1263 (11th Cir. 2010) ......................................................... 32

*Scott v. Harris*,
    550 U.S. 372 (2007) ......................................................................... 27

*Sevigny v. Dicksey*,
   846 F. 2d 953 (4th Cir. 1988) ....................................................... 29, 39

*Skop v. City of Atlanta*,
   485 F.3d 1130 (11th Cir. 2007) ......................................................... 46

*Thompson v. Clark*,
   142 S. Ct. 1332 (2022) ................................................................... i, 31

*Tillman v. Coley*,
   886 F. 2d 317 (11th Cir. 1989) ........................................................... 30

*United States v. Martin*,
   615 F.2d 318 (5th Cir. 1980) ..................................................... 1, 33, 44

*W. Point-Pepperell, Inc. v. Donovan*,
   689 F.2d 950 (11th Cir. 1982) ....................................................... 15, 34

*Washington v. Howard*,
   25 F.4th 891 (11th Cir. 2022) .......................................... i, 16, 29, 31

*Washington v. Rivera*,
   939 F.3d 1239 (11th Cir. 2019) ......................................................... 29

*Whiteley v. Warden*,
   401 U.S. 560 (1971) ........................................................................... 34

*Williams v. Aguirre*,
   965 F.3d 1147 (11th Cir. 2020) ..................................................... i, 31

*Zadeh v. Robinson*,
   902 F.3d 483 (5th Cir. 2018) ............................................................. 47

## Statutes and Rules

28 U.S.C. § 1291 ................................................................................... 1

28 U.S.C. § 1331 ................................................................................... 1

42 U.S.C. § 1983 ............................................................................... 1

### Treatises and Secondary Sources

William Baude,
  *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45 (2018)........................ 46

Restatement (Third) of Torts: Phys. & Emot. Harm (2010)............................ 32, 33

Joanna C. Schwartz,
  *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797 (2018) ... 47

Charles Alan Wright et al., 10B Fed. Prac. & Proc. Civ. (4th ed.) ........................ 37

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

This case asserts a violation of the Fourth Amendment under 42 U.S.C. § 1983. The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291.

This is a direct appeal from the district court's order adopting the magistrate judge's report and recommendation and granting Defendants' motion for summary judgment. *See* Doc. 119 (Report and Recommendation); Doc. 126 (Order). The district court entered final judgment in their favor on August 29, 2022. Doc. 127. Plaintiff timely filed his notice of appeal on September 22, 2022. Doc. 128.

## STATEMENT OF THE ISSUES

1.    A family member told Detective Barnett she talked to Harry Hubbard and knew he was alive and well at 9:30pm—or one and a half hours *after* Keith Sylvester had strangled the Hubbards to unconsciousness and set their home on fire according to Barnett's theory of the case. Barnett also reviewed phone records he subpoenaed which corroborated this call. Must a jury conclude Barnett was *unaware* of the phone call, as the district court found, or would a jury be entitled to find Barnett knew about the phone call that made Barnett's theory of the case a metaphysical impossibility?

2.    Before a warrant can initiate valid legal process, a magistrate must be provided all material facts relevant to probable cause. While Barnett provided inculpatory facts that, in isolation, may have amounted to probable cause, he did not disclose other facts showing that his theory of Sylvester's guilt was not viable. Where an officer fails to disclose known and readily available wholly exculpatory facts and a warrant issues, is legal process constitutionally infirm?

3.    This Court has held that arguable probable cause is not enough to defeat a claim that a malicious prosecution plaintiff was subjected to more than a brief period of detention based on constitutionally infirm legal process. Did the district court err in concluding that mere arguable probable cause would justify Sylvester's fifteen-month detention?

## STATEMENT OF THE CASE

### A.    *Statement of Facts*

#### 1.    Synopsis and Barnett's Theory of the Case

Deborah Hubbard and Harry Hubbard were married and had been living together in Buffalo, New York until late 2017. Doc. 101-5. At that time, there was a fallout from Harry's infidelity which had been captured on a dashboard camera gifted to him by his stepson, Plaintiff Keith Sylvester. Barnett Dep. 120:20–121:2; Doc. 113-7 ¶ 10. Deborah then moved to Atlanta, where her son Sylvester lived, and purchased a home at 2495 Harvel Drive NW, Atlanta, Georgia 30318. Doc. 101-5; Doc. 123-3 ¶ 2.

On Friday June 29, 2018, Harry called asking Deborah to buy him a plane ticket to come down to Atlanta that day. Harry came down the next day, *see* Exhibit A, CVSA Converted part 1.mp4 at 5:21–6:19, but without any luggage or even a change of clothing, *see* Barnett Dep. 121:10–122:6.

On Monday July 2, 2018, Plaintiff and Harry went shopping together at a Wal-Mart during the day. Plaintiff then visited with Deborah and Harry at Deborah's home until 8:00 pm, when he left. Barnett Dep. 91:12-18; 94:24–95:21; 162:4-11.

The evidence is *undisputed*, and Defendant agrees, that Plaintiff did not enter the Hubbards home at any time after 8:00pm, until well after the flames had

been extinguished and the Hubbards were found inside deceased. *See id.*; *see also* Exhibit A, Complete AT&T Phone Records.pdf at 3,135– 3,150 (Items 14068– 14133); Doc. 101-2 at 6 ("I requested Keith Sylvester's cell phone records for (804-503-6505) to assist in establishing an accurate time lime [sic] of his movements in the days and weeks prior to the fire.").

Based on Plaintiff's supposedly odd demeanor, the unfortunate coincidence that Plaintiff had driven to the home at 3:00am even though he did not go inside, and—at least on Plaintiff's facts at summary judgment—significant liberties with the facts, Barnett suspected Plaintiff of murdering the Hubbards by strangling them and setting Deborah's home on fire.

Barnett's theory of the case was that Sylvester had strangled his mother and stepfather and set the house on fire "[e]arlier in the evening of the 2nd," before he left the house for the final time at 8:00pm. Barnett Dep. 94:24. He elaborated as follows:

> My theory was that he strangled his parents and -- mom and stepdad, set the fire and then left driving around the city waiting for that 911 call. And then finally around 3:00 a.m. he returns to the house to check on the progress of the fire because he can't understand why the house isn't burning down. That was my theory.

*Id.* at 94:24–95:6.

4

2.    The Basic Facts Barnett Knew Showing His Theory Was a Metaphysical Impossibility

Barnett knew, and understood, that Plaintiff was last inside Deborah's home at 8:00pm on July 2, 2018. Barnett Dep. 91:12-18; 94:24–95:21; 162:4-11. Plaintiff did drive into his mother's driveway at about 3:00am,[1] but video showed he did not get out of the car.

Barnett also knew, and understood, that the Hubbards were alive during the fire. He knew this from hours of conversations with Dr. Henniger, the medical examiner, who told him that the Hubbards were breathing in smoke based on the presence of soot in their lungs and the elevated levels of carboxyhemoglobin in their blood. Barnett Dep. 197:16–198:2; Dr. Heninger Dep. 35:7–17.

A jury could find that Barnett knew, or the very least should have known, that the fire was not a slow burn fire—meaning that he knew that it had been started minutes before the fire became visible from the outside at around 4:00am— or many hours after Plaintiff last left at 8:00pm. Bonner Dep. 33:5–12 ("[B]ased on what I reviewed at the time, from what I saw, I would say that this is not a slow

---

[1] Plaintiff said that he drove by at 3:00am because Deborah was often up drinking coffee and smoking cigarettes at this hour and because he wanted to check on his ice cream truck, which was plugged into her home via an extension cord. Exhibit A, CVSA Converted Part 1 at 12:20–12:41. Plaintiff saw the flicker of a citronella candle through a front window, but otherwise it appeared like people were sleeping and the truck was ok, so he left. *Id*.

smoldering fire."); *see also* n.17, *infra*.

Barnett also knew, and understood, that Harry Hubbard had a phone call with his granddaughter Nyaira Walton at 9:30pm on July 2, 2018. Walton told Barnett about her conversation with Harry Hubbard on the evening of July 2, 2018. *See* Exhibit A, Nyaira Walton.amr at 1:27–2:30. Walton told Defendant that she spoke to Harry on the phone at 9:30pm on July 2, 2018. *Id.* Defendant obtained and reviewed Deborah and Harry's cell phone records for July 2, 2018. Barnett Dep. 90:17–20. Harry's cell phone records showed that he had a phone call with Walton at 9:20pm, consistent with the timing and duration of the call that she described having with Harry Hubbard. Doc. 87-4 (Item No. 4898–4900).[2]

Walton told Defendant that when she spoke to Harry Hubbard, he said he was "fine" and there was no issue of any kind and nothing "interesting" about the call. *See* Exhibit A, Nyaira Walton.amr at 2:15–2:30. At the time of the phone call, Harry was inside Deborah's home. Doc. 87-4, AT&T Phone Records Excerpt (row 4900 shows latitude and longitude coordinates of the cell phone's location, showing it at the mother's house); Doc. 113-5, Cell tower nearest to Harvel Dr. The phone records from Deborah Hubbard and Harry Hubbard also showed that

---

[2] UTC time is four hours ahead of Eastern Standard Time during Daylight Savings Time, meaning that the 34 second call at 01:20 on July 3, 2018 took place at 9:20 pm.

neither Deborah Hubbard nor Harry Hubbard left the home after 8:00pm. *See id.* (cell location column shows longitude and latitude, at a cell tower at Harvel Drive).[3]

Taking these basic facts together, Barnett knew that his theory of the case was an impossibility. Simply put, there was no way the Hubbards could have been strangled to unconsciousness, but not death, and had their house set on fire sometime before 8:00pm when Harry Hubbard had a phone call with his granddaughter when all was well at 9:30pm.

There is no explanation for why the Hubbards would remove the ligatures purportedly found around their necks in the aftermath after Plaintiff left the home and then reapply them after the 9:30pm phone call. There is no explanation for why the Hubbards did not react in any way to a slow burning fire in their home that had been ongoing for at least an hour and a half by the time Walton and Harry spoke.

Barnett, thus, knew that Plaintiff "was not present at the scene" at the time of any crime. This was the reason that the prosecutors dismissed the charges against Plaintiff. Doc. 113-11 at 1. The fact that Plaintiff was not present at the

---

[3] More detailed cell records for Deborah, Harry, and Plaintiff are found in Exhibit A, Complete AT&T Phone Records. These records show Plaintiff's minute by minute location, and that he did not go near Deborah's home after 8:00pm

scene was not disclosed to the magistrate. The warrant application indicates that Plaintiff was the one that strangled the Hubbards and set Deborah's home on fire. There is no mention of any purported accomplice and no evidence to support that theory.

### 3.    The Warrant's Material Exculpatory Omissions and False Inculpatory Facts[4]

Barnett testified that his written warrant application included all of the known material facts, and that he did. not provide any other facts to the magistrate. Doc. 113-2 ¶¶ 284–285. The decision to seek the warrant was his alone. *Id.* ¶¶ 286. A reasonable juror could find that Defendant knew the following major facts in his warrant application were false:

Defendant stated that "[a]rson investigators also learned that the beneficiary of the house insurance police [sic] was Keith Sylvester." Doc. 101-5 at 2. At Plaintiff's preliminary hearing, Barnett testified that he understood Plaintiff would receive "between $150,000 and $200,000." Doc. 113-12 at 12:15–23. But he knew that Plaintiff was not the sole beneficiary and that arson investigators had told him

---

[4] The lower court indicated that Plaintiff's recitation of facts was lengthy and contained copious amounts of immaterial information. Counsel regrets any superfluous information and has attempted to streamline the facts as much as possible. In relating the facts in this brief, Plaintiff has cited to the following paragraphs: 14–15, 22, 27–36, 38, 41–54, 64, 68–79, 82, 84–88, 91–139, 142–162, 164–168, 171–208, 222–289.

no such thing. *See* Doc. 113-2 at ¶¶ 93–117. The arson investigators emphatically stated that they did not tell Barnett this fact. *See id.* In reality, Plaintiff was not a named beneficiary—much less the sole beneficiary—as was evident from the face of the policy that Barnett had. The payout to Plaintiff would be approximately $2,000, Doc. 113-3, Hornsby-Culpepper Decl. ¶ 15, or less than two weeks' wages, Doc. 113-7 ¶ 13. Insurance is the only fact in the warrant going to motive, and it is false.

Barnett swore in his warrant application that "Keith Sylvester is the only person with motive, opportunity, and ability to have committed this crime." Doc. 101-5 at 2. As to opportunity and ability, that statement is false. Barnett knew that Plaintiff had not been in the house for more than eight hours prior to the fire. Doc. 113-2 at ¶¶ 68–70, 87. He knew or should have known that there was no slow burn fire. *Id.* at ¶¶ 71, 76–79, 92, 118–125. He knew that the Hubbards were alive during the fire. *Id.* at ¶¶ 72–75, 88, 126–132. And he knew that Harry had a phone call inside the home after he was supposedly strangled to an unconsciousness from which he would never recover. *Id.* at ¶¶ 82, 84–86, 91, 142–149, 175.

Defendant stated, or at least heavily intimated, that the items from Wal-Mart were used to start the fire. Doc. 101-5 at 1–2. But he knew that the citronella candles were not used in the fire. Doc. 113-2 at ¶¶ 16, 22, 36, 154, 158. He knew, or should have known, that the two boxes of mothballs were unopened because

they were on the kitchen counter he walked by repeatedly and the unopened boxes conspicuously appear in photos and video he reviewed. Doc. 113-2 at ¶¶ 14–15, 35, 151, 157, 161–62. He knew that the GBI lab and the K9 did not detect any isopropyl alcohol, including when the K9 sniffed Plaintiff's person and vehicles at the scene. Doc. 113-2 at ¶¶ 34, 161. And he knew that the isopropyl alcohol was at Plaintiff's home. Doc. 113-2 at ¶¶ 156.

A reasonable juror could find that Defendant knew the following additional facts in his warrant application were false:

- Defendant stated that Plaintiff suspiciously volunteered the video evidence from his dashboard camera because he was not a suspect at the time. Doc. 101-5 at 1. But he knew that the coincidence of Plaintiff being at Deborah's home an hour beforehand was bad, and that Plaintiff was treated as a suspect from the very start. Barnett Dep. 82:3–13 (testifying he considered Plaintiff a suspect "right from the start" as did other officers); Doc. 113-2 ¶¶ 49–54. Plaintiff was told he was not free to go, and was not allowed to move, even as he did not ask to leave. Doc. 113-7 ¶¶ 5–9.[5]

- Defendant stated that Plaintiff bought his wife a plane ticket to Virginia the day before the fire after he learned that Harry was coming into town to facilitate the murder without the wife as a witness. Doc. 101-5 at 2. But Defendant knew that Melissa had purchased her own ticket and that the ticket was purchased before anyone knew Harry was coming home to Atlanta. Doc. 113-2 at ¶¶ 184–194.

- Defendant stated that Deborah and Harry had reconciled their marriage and agreed to move back to Buffalo together. Doc. 101-5 at 1. But he knew

---

[5] Throughout the entirety of the investigation, Defendant acknowledged that Plaintiff was "very cooperative" and "always volunteering information" and eager to talk "at any time" and to permit law enforcement to "search everything." Barnett Dep. 143:8–13.

that there was conflicting evidence on this point and credible witnesses stated there was no reconciliation and no plan to move to Buffalo. Doc. 113-2 at ¶¶ 178–183.

- Defendant stated that family members "raised concerns" about Plaintiff. Doc. 101-5 at 2. But he knew that these statements were generally non-specific, not relevant, without any foundational basis, and often so fantastical as to not be believable. Doc. 113-2 at ¶¶ 222–227.

- Defendant stated Plaintiff "showed deception" on a computer voice stress analysis (CVSA) test. Doc. 101-5 at 1. But he knew that Plaintiff had answered the relevant questions without deception and without inculpating himself seven out of eight times, that the specific question he allegedly showed deception on he had answered two times without any indication of deception, and that the lines for the question that was supposedly indicative of deception did not look different from any other set of lines. Doc. 113-2 at ¶¶ 258–275. Barnett was also prohibited from using any CVSA information in the warrant application. *See* APD.SOP.3120 § 4.4.6.3 ("Results from a CVSA examination cannot be used in any affidavit portion of an arrest or search warrant and taken alone do not provide substantiation for a criminal charge." *available at* https://www.atlantapd.org/home/showpublisheddocument/4302/6376668 99583630000).

- Defendant stated that Plaintiff had an inconsistent timeline of when he left Deborah's house. Doc. 101-5 at 1. But Defendant was "sure [Plaintiff] was exactly where he said he was when he said he was" with "no doubt about that." Doc. 113-2 at ¶¶ 68–69, 87.

- Defendant stated that Deborah was strangled by "wires from a cable junction box." Doc. 101-5 at 1. But he knew that Deborah was not strangled with any kind of wire and that instead she was surrounded by hundreds of feet of cables and wires that fell on top of her from the fire. Doc. 113-2 at ¶¶ 41–44, 165–168.

- Defendant stated that the locked doors pointed to Plaintiff as the culprit. Doc. 101-5 at 2. But he knew that the exterior doors (except for the burglar bar) could be locked from the inside on the way out, that Deborah's keys

were missing and not recovered from the fire, that the burglar bar door was open and that no one ever had the keys to that door. Doc. 113-2 at ¶¶ 242–257.

A reasonable juror could find that Defendant intentionally or recklessly omitted the following exculpatory facts:

- Defendant knew Plaintiff was not at the home for eight hours before the fire. Doc. 113-2 at ¶¶ 68–70, 87. In other words, Plaintiff was "not present at the scene" at the relevant time, as the DA's office stated in its dismissal before Sylvester was ever indicted.

- Defendant knew Deborah and Harry were alive in the fire, meaning that they had not been strangled to death. *Id.* at ¶¶ 72–75, 88, 126–132.

- Defendant should have known that a person who is strangled to unconsciousness but not death regains consciousness within seconds, or at the very latest, within minutes. *Id.* at ¶¶ 171–176.

- Defendant knew, or should have known, that there was no evidence of a slow burn fire. *Id.* at ¶¶ 71, 76–79, 92, 118–125.

- Arson investigators told Defendant the fire was not a slow burn fire. *Id.* at ¶¶ 71, 122–124; *see also* Bonner Dep. 33:5–12 ("[B]ased on what I reviewed at the time, from what I saw, I would say that this is not a slow smoldering fire . . . I would say that roughly minutes after the fire started probably would show some signs" and "it would take not too long before it showed.").

- Defendant knew, or should have known, that a slow burn fire is inconsistent with the use of accelerants. Dorgan Dep. 35:23–36:1.

- Defendant knew the K9 sniffed the premises and found no evidence of accelerant. *Id.* at ¶¶ 27–31.

- Defendant knew the K9 sniffed Plaintiff, his personal vehicle, and his ice cream truck and found no evidence of accelerant—including isopropyl alcohol—even though Plaintiff was wearing the same clothes as earlier in

the day, except for his t-shirt. *Id.* at ¶¶ 30, 32–33.

- Defendant knew the GBI tested the scene for accelerants, to specifically include isopropyl alcohol, and found none. *Id.* at ¶¶ 34, 161.

- Defendant knew Harry had no evidence of strangulation or foul play observed at the scene, and he should have known Harry had none of the expected indications of strangulation at the autopsy. *Id.* at ¶¶ 38, 45–49, 177.

- Defendant did not wait for the autopsies to be complete before he sought a warrant, and he knew or should have known that the medical examiner did not understand how Barnett's theory was correct. *Id.* at ¶¶ 163; 170–177.

- Defendant knew that he disagreed with the medical examiner about what might have been used as a ligature. *Id.* at ¶¶ 133–139, 164–168.

- Defendant knew it was unexplained how the ligature around Harry could have burned away 100% but Harry's skin was burned 0%. *Id.* at ¶¶ 138–139.

- Defendant knew Deborah was found entangled with hundreds of feet of wire that were clearly not used to strangle her. *Id.* at ¶¶ 41–43.

- Defendant knew, or should have known, Harry and Deborah lacked most of the hallmark forensic indications of strangulation, making the case for strangulation significantly weaker. *Id.* at ¶ 179.

- Defendant obtained the USAA homeowner's policy, which he knew did not name Plaintiff. *Id.* at ¶¶ 97, 102–105, 107–108.

- Defendant knew Plaintiff's location—which was away from the Harvel Drive home from 8:00pm to 4:45am—was corroborated by GPS, surveillance video, dashboard camera video, and automatic license plate reader data. *Id.* at ¶¶ 68–70.

- Defendant knew Harry had a conversation from inside the Harvel Drive home with Nyaira Walton in Buffalo at approximately 9:30pm in which all was well, according to both Walton and Harry's phone records. *Id.* at

¶¶ 142–149.

- Defendant knew the family members in Buffalo who purported to say generally incriminating things about Plaintiff also told Defendant genuinely absurd and easily falsified facts, such as that Deborah murdered her three prior husbands, that Plaintiff removed all of Deborah's teeth, and that any number of other family members were suspected to have committed the crimes. *Id.* at ¶¶ 222–227.

- Defendant knew many family members believed that Plaintiff could not possibly have done this. *Id.* at ¶¶ 228–232.

- Defendant knew that he manipulated family members to say mean things to him about Plaintiff. *Id.* at ¶¶ 195–208.

- Defendant knew Deborah wore a lot of gold jewelry that was not found at the home and never associated with Plaintiff, despite Defendant's investigation. *Id.* at ¶¶ 233–241. The fact that Plaintiff was not connected to the jewelry, when Defendant suspected a financial motive, undercuts probable cause.

- Defendant knew Deborah's keys and purse were not found at the home and never associated with Plaintiff, despite Defendant's investigation. *Id.* at ¶¶ 242–257. The fact that these items were missing and not found with Plaintiff increased the chances of a random robbery.

- Defendant knew Antonio Penn, who Plaintiff hired to work on his mother's air conditioning, visited the home on July 2 and saw an unidentified individual on the roof messing with the wires that ran from the street to the home. *Id.* at ¶¶ 276–283. Defendant also knew that the Hubbards were smokers. *Id.* at ¶ 64. Defendant knew that "the big thing" for determining whether or not the fire was accidental was whether there was soot in her lungs, which would have indicated the fire was more likely accidental. *Id.* at ¶ 128. These facts increase the likelihood of an accidental fire.

    4.    Purportedly Inculpatory Facts Not Disclosed to the Magistrate

Defendant and the lower court cited to facts in support of summary

14

judgment that Barnett did not disclose to the magistrate. Facts that were not provided to the magistrate at the time of the warrant cannot be considered. *See W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982) ("[J]udicial review of the sufficiency of an affidavit for the issuance of a warrant must be strictly confined to the information brought to the magistrate's attention.").

The most significant of these facts are as follows:

Barnett claimed he was told that Plaintiff deleted some unknown portions of his dashboard camera video. In any event, that fact is disputed. There were no deleted portions, which is shown both by Plaintiff's testimony, *see* Doc 113-7 ¶ 4, and by the fact that no one could determine where any deletion might have come from, Barnett Dep. 161:16–162:3. Because Defendant knew Plaintiff's location at every relevant moment, *see id.* at 162:411, and because he could not identify a single moment that was not present in the dash camera video that supposedly should have been present, a reasonable inference is that any deletion was not from any remotely material time.

Barnett claimed he consulted with other officers who all agreed Plaintiff was culpable. That is directly disputed, as the arson investigators testified that they asked to meet with Defendant to discuss the case, but he blew them off, Dorgan Dep. 26:8–27:1, and that they did not have enough information to believe there was probable cause for Plaintiff's arrest, Dorgan Dep. 25:19–26:1. Further, there is

no evidence Barnett made the requisite disclosure of facts to be able to rely upon these officers' opinions. *See Gleghorn v. Koontz*, 178 F.2d 133, 136 (5th Cir. 1949) (reliance on the opinion of others "is not available as a defense to [a malicious prosecution claim] unless the defendant is shown to have made a full and fair disclosure, in good faith, of all the facts known to him bearing upon the guilt or innocence of the accused, and upon which the criminal prosecution is sought to be based."); *Washington v. Howard*, 25 F.4th 891, 904 (11th Cir. 2022) (officer's reliance is conditioned on "fully and honestly plac[ing] evidence before the" decisionmaker).

One family member said Plaintiff made a disturbing Facebook post before the Hubbards' death. Plaintiff made no such post. Doc. 123-3 at ¶¶ 3–4.

And Barnett claimed that a USAA employee told him that Plaintiff seemed more concerned with money than with his parents' death. Plaintiff's conversation with this representative did not concern insurance proceeds. *See generally* Doc. 123-2 (transcript of call). And Barnett knew as much because he obtained all of USAA's files, including the transcript before obtaining a warrant. Barnett Dep. 68:5–9.

     5.    Cornelius Muckle Arrested and Facing Trial for the Hubbards' Deaths

The Fulton District Attorney's Office dismissed the charges against Plaintiff after they determined what should have been obvious from the start: Plaintiff "was

likely not present at the scene of the crime during the commission of the crime."
Doc. 113-11 at 1. After the dismissal of the charges against Plaintiff, Cornelius
Muckle was charged with the murders. Barnett Dep. 25: 20-25. Unlike Plaintiff,
Muckle's cell phone records place him at the Harvel home for an extended period
of time right before the fire started. Doc. 113-11 at 6–8. Also in contrast to
Plaintiff, there is significant evidence Muckle was pawning jewelry consistent with
the jewelry belonging to Deborah Hubbard in the immediate aftermath of her
death. Defendant acknowledges that there is no connection between Plaintiff and
Muckle. *See* Doc. 101-2 at 22; Doc. 101-1 ¶ 17; Doc. 113-2 ¶¶ 287–292. As of this
filing, Muckle is awaiting trial on these charges. *See State v. Muckle*, No.
21SC177971 (Fulton Super. Ct.).

## B.    *Procedural History*

Plaintiff filed suit *pro se* against a host of Defendants while in custody and
while the criminal charges against him were pending on September 23, 2019. Doc.
1. Following an amendment, the case was narrowed significantly and then stayed
until the charges against him resolved. Doc. 14.

On March 4, 2020, all charges against Plaintiff were dismissed. Plaintiff then
continued to litigate the case briefly *pro se* before counsel entered an appearance
and amended the complaint to state Fourth Amendment claims against Detectives
Barnett and Darin Smith. Doc. 40. The case was litigated through discovery before

the District Judge, before being referred back to the Magistrate Judge to resolve a discovery dispute, Doc. 86, and later summary judgment, Doc. 101.

The Magistrate Judge entered a report and recommendation that recommended that summary judgment be granted to Detective Barnett. Plaintiff had previously agreed to abandon any claim against Smith. The report and recommendation considered facts beyond those limited facts identified as material by Defendant. *See* Doc. 113-1 (17 material facts, of which 9 were disputed).

Plaintiff timely filed his objections to the report and recommendation and obtained leave to file a response to the facts relied upon by the Magistrate Judge that the Defendant did not cite. *See* Doc. 121 (citing Fed. R. Civ. P. 56(f) and 72(b)(3)).

The district court overruled Plaintiff's objections, adopted the report and recommendation, and granted summary judgment. Doc. 126. The court entered a final judgment. Doc. 127. Plaintiff timely appealed. Doc. 128.

## SUMMARY OF THE ARGUMENT

On the morning of July 3, 2018, Deborah and Harry Hubbard died in a house fire. Deborah's son, Plaintiff Keith Sylvester, was charged with heinous crimes he did not commit in connection with their deaths. Sylvester was jailed for approximately fifteen months before he was released based on the evidence showing that he was "not present at the scene of the crime during the commission of the crime." Doc. 113-11 at 1, Nolle Pros. While Sylvester's extended detention for crimes he did not commit compounded the tragedy of the loss of his parents, Plaintiff's unlawful seizure claim requires him to prove not just tragic circumstances. Plaintiff must prove that the detective responsible for his arrest and prosecution acted culpably. Plaintiff can do that at trial, and he has presented sufficient evidence at summary judgment from which a jury could find that Defendant Detective James Barnett violated the Fourth Amendment.

*First*, a reasonable jury could conclude that, at the time he procured the warrant, Barnett knew facts that proved that his claimed theory of the case was fundamentally and hopelessly unviable. He had "no doubt" Plaintiff was last in Deborah's home at 8:00pm based on Plaintiff's GPS records, as corroborated by surveillance video, dashboard camera video, and automatic license plate readers. He knew the Hubbards were alive during the fire based on soot in their lungs and carboxyhemoglobin in their blood. He knew that any fire set by Plaintiff would

19

have had to have been set before 8:00pm. And he knew that Harry and his granddaughter Nyaira Walton had a phone call at 9:30pm where Harry was "fine"—meaning he had not been strangled and the home was not on fire. The lower court found that there was no evidence Barnett knew about the call between Walton and Harry. But a recording shows that Walton told Barnett the facts about this call. From that, a jury could find he knew.

*Second*, a reasonable jury could find that Barnett caused the legal process to go wrong. A jury could find that Barnett knew material exculpatory facts eliminating probable cause and that he knowingly or recklessly failed to disclose those facts to the magistrate. The jury could also find that he intentionally or recklessly provided additional false inculpatory facts. Separately, Barnett should have known that his warrant application failed to establish probable cause based on the totality of the known, and readily knowable, facts.

*Third*, if a jury accepts Plaintiff's well supported facts over Defendant's at trial, Barnett would not be entitled to qualified immunity. Under *Franks*, if a plaintiff shows intentional or reckless misstatements or omissions that eliminate *actual* probable cause, the defendant-officer is not entitled to qualified immunity based on the clearly established law from *Franks* and the heightened *mens rea*. And under *Malley*, whether the standard is actual or arguable probable cause, it was lacking because the facts affirmatively excluded Plaintiff as a potential culprit.

## <u>ARGUMENT AND CITATION OF AUTHORITY</u>

I.    **A REASONABLE JURY COULD FIND DEFENDANT KNEW HIS THEORY OF THE CASE AS ARTICULATED TO THE MAGISTRATE WAS IMPOSSIBLE**

Plaintiff opposed summary judgment, asserting in large part that the phone call between Nyaira Walton and Harry Hubbard at approximately 9:30pm made Defendant Barnett's theory of the case against Sylvester metaphysically impossible. Defendant did not respond. The Magistrate Judge's report and recommendation did not address this portion of the Walton call. Doc. 119. The District Judge's opinion adopting the report and recommendation found that "Plaintiff has not presented any evidence that Defendant was aware of the phone call at the time that he prepared the arrest warrant affidavit and Defendant testified that he was not aware of it." Doc. 126 at 10. Plaintiff submits that the Walton call is dispositive to the question of probable cause and that a reasonable jury could readily conclude that Barnett knew about it at the time of the warrant application. In any event, a jury would be entitled to conclude that even if Barnett was not subjectively aware of the Walton call, he should have known these key facts because they were readily available to him.

Detective Barnett's stated theory at the time of the warrant application was that Plaintiff Keith Sylvester strangled Deborah Hubbard and Harry Hubbard and set their home on fire to cover the crime. Barnett Dep. 94:24–95:6. Because

21

Deborah and Harry had soot in their lungs and high carboxyhemoglobin levels in their blood, he knew that they were alive in the fire. Barnett Dep. 197:16–198:2; Dr. Heninger Dep. 35:7–17. Because he had "no doubt" that Plaintiff was last in Deborah's home no later than 8:00pm, Barnett Dep. 91:8–18, the strangling and the fire setting had to have happened before that.

Plaintiff notes that Defendant did not disclose these material facts about the slow burn fire, the Hubbards being alive, or his knowledge that Plaintiff was last in the home at 8:00pm to the magistrate. While not as gravely exculpatory as the facts surrounding the Walton phone call detailed below, each of these facts is at least exculpatory insofar as each raises questions that Defendant would not have been able to answer in a manner consistent with a viable theory of Plaintiff's guilt.[6]

---

[6] If the magistrate knew the fire had been started eight or more hours before a 911 call, and was not visible in any way at 3:00am as is known from Plaintiff's dash camera video, she would have likely asked *what is the evidence of a slow burn fire?* Barnett would have been forced to concede that he knew that the arson investigators told him it was not a slow burning fire, or that he had never asked them. Doc. 101-2 at 18 (reporting he was told by arson investigators that "the fire was probably not started the previous evening of July 2, 2018 and was not a slow burn."); *see also* n.17, *infra* (explaining that a jury could find he knew this at the time of the warrant).

If the magistrate knew that the Hubbards were purportedly strangled to unconsciousness but not death more than eight hours before the fire, she would have likely been prompted to ask *how long does a person stay unconscious under such circumstances before coming to?* To this question, Barnett would have had to admit that either he had no idea or that he knew from the medical examiner that someone would regain consciousness in "seconds" or at the "tail end" a matter of

But there is simply no explanation for Barnett's failure to disclose the 9:30pm phone call between Nyaira Walton and her grandfather Harry. Walton and Barnett discussed the phone call that happened at 9:30pm. Barnett knew about the call because he was a participant in the call:

Barnett:    So, the last time that you talked to Bootsie was 9:30 on the second?[7]

Walton:    Yes.

Barnett:    Okay.

Walton:    Because I was staying in his house. While he was down there, I was staying in his house. And called me and was like, "What you doing?" I was like, "I'm on my way back from the beach."

Barnett:    He called you, or you called him?

Walton:    He called me. He called me, and I was like, "I'm going to call you when I get back to your house, because I'm leaving the beach with my friend." And he was like—

Barnett:    Okay. Exactly where were you? I mean, it was 9:30, and where were you at? Because I'm trying to think of time zone changes.

---

"just a few minutes," making his theory "not possible." Henninger Dep. 71:6–72:6; 75:19–76:4.

If the magistrate knew what Defendant knew—that Plaintiff was last in the house at 8:00pm—and she knew that there was no evidence of a slow burn fire and that the Hubbards could not have been strangled eight hours earlier, she would have asked *Since its not Sylvester, who did the strangling and the arson?*

[7] The family often called Harry by the nickname "Bootsie."

| | |
|---|---|
| Walton: | I was leaving from the beach, Southside Beach. |
| Barnett: | Where? |
| Walton: | Southside Beach in Buffalo. |
| Barnett: | Okay. Is that Eastern time also? |
| Walton: | Yes. |
| Barnett: | Okay. So, it was 9:30 here and 9:30 there. |
| Walton: | Yes, at night. |
| Barnett: | And he called you at 9:30pm, on the second, before all this fire broke out, and he said he was fine? What else did he have to say? Did he say anything interesting? |
| Walton: | No. I didn't really get a chance to talk to him, because when he called, mind you, I just told you, I said, "I'm going to call you back, I'm leaving the beach with my friends." I never ended up calling him back. I got that call the next morning. I never, ever ended up calling him back. |

Nyaira Walton.amr at 1:27–2:40.[8]

Although Barnett was careful to get the timing right by asking Walton to

confirm the time zones, and that the call was at night, and he confirmed that Harry

called her and not the reverse, a jury could find that he already knew these facts

because he had obtained the Hubbards and Sylvester's phone records from AT&T

---

[8] This is an unofficial transcription of the audio file produced by transcriptionists with rev.com.

via a warrant. Barnett Dep. 90:17–20. Note also, that Barnett is the one who first states the time of the call between Walton and Harry, giving rise to an inference that he had reviewed the phone records before the call with Walton. *See generally* Nyaira Walton.amr at 0:00–1:27. These cell phone records also showed that Harry was having this phone call with inside Deborah's home. Doc. 87-4, AT&T Phone Records Excerpt (row 4900 shows latitude and longitude coordinates of the cell phone's location, showing it at the mother's house); Doc. 113-5.

The significance of this phone call is that it renders Barnett's theory of Sylvester's culpability for the deaths of Harry and Deborah impossible. There is simply no way the Hubbards were strangled to the point that they never regained consciousness and then Harry had an uneventful phone call with Walton thereafter. Harry would have had to remove the ligature from his neck to speak, but then Barnett states that the ligature was on his neck at the time of the fire. Similarly, according to Barnett's theory, Deborah's home was on fire at this point with a slow, smoldering fire. Harry mentioned none of this to Walton, and apparently took no action to stop the fire. This evidence not only proves that there was a lack of probable cause, it also shows there is simply no explanation for how Plaintiff could have possibly committed the crimes alleged.

The lower court found that there was no evidence that Barnett "was aware of the phone call at the time that he prepared the arrest warrant affidavit and

Defendant testified that he was not aware of it." Doc. 126 at 10. There is competent summary judgment evidence to the contrary.

*First*, Barnett was a participant in the call with Walton, meaning that a jury could find he knew about the call. He asks pointed questions about who called who and the applicable time zone, showing that he understood not only that the call happened but also its implications for the timeline.

*Second*, the evidence is sufficient for a jury to conclude that Barnett's call with Walton happened before the warrant application. Although the audio file is not dated as are most of Barnett's other recorded calls, the two times Barnett spoke with Walton per his investigative summary were July 4 and August 2, 2018. *See* Doc. 101-2 at 5, 11.[9] Those dates are before the December 28, 2018 date of the warrant. Based on the contents of the call between Walton and Barnett, and Barnett's investigative summary, a jury could readily find that this call happened on either date. For the July 4 date, the summary describes Walton sending "text pictures" to Barnett, which is how the discussion between her and Barnett beings. *See* Doc. 101-2 at 5; Nyaira Walton.amr at 0:00–0:05 ("I just texted you pictures off of my phone."). For the August 2 date, the summary describes Walton's "suspicions" about Plaintiff, Doc. 101-2 at 11, and having already obtained and

---

[9] The investigative summary tracks when each investigative activity occurred under the date each occurred. The July 4 entry begins on page 3.

analyzed the AT&T records for Harry's phone that would have clued Barnett into the timing of the call between Walton and Harry that Barnett is the first to bring up, Doc. 101-2 at 7, 8. Regardless, the call was clearly before the warrant because Barnett stated that Deborah had yet to be identified. Nyaira Walton.amr at 16:36–16:56.

*Third*, there is no record evidence that Barnett testified that he was unaware of the call with Walton. The district court did not cite to evidence when it stated that Barnett so testified. Plaintiff's counsel elected not to directly confront Barnett with the Walton call. *But see* Barnett Dep. 167:8–13 ("Q. For example, if Harry Hubbard is making phone calls after Keith Sylvester has left the home, that would tell us that Keith -- that Harry Hubbard was still alive and wasn't passed out from strangulation, right? A. Possibly, yes."). At no point in the deposition does Barnett state that he was never told about the call between Walton and Harry. Had he so testified, that would have been false testimony because there is a recorded call that directly controverts Barnett's testimony. *Cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) (testimony can be "so utterly discredited by [recordings in] the record that no reasonable jury could have believed" it).

*Fourth*, in addition to the call between Barnett and Walton about her call with Harry, Barnett had the AT&T phone records he himself had obtained via a warrant that corroborated Walton's account in material part. *See* Exhibit A, AT&T

Phone Records Excerpt & Doc. 87-4 (Excerpt) (row 4900 shows a short call from the stepfather to Nyaira Walton at 1:20am July 3rd UTC time, which is 9:20pm July 2nd in Eastern Standard Time). There is some evidence that Barnett reviewed these records. In the call with Walton, he is the first to bring up the call time, indicating that he already knew about the call. There is no dispute that he had the phone records as of July 8, 2018. *See* Doc. 101-2 at 7. And more fundamentally, why would an officer obtain a warrant for phone records only to ignore the most material portion of the phone records? That question is all the more significant where Barnett recognized that "[p]hone records are always good leads." Barnett Dep. 167:4–7; *see also* Doc. 101-2 at 6 ("I requested Keith Sylvester's cell phone records for (804-503-6505) to assist in establishing an accurate time lime [sic] of his movements in the days and weeks prior to the fire.").

Regardless of whether Barnett subjectively reviewed the AT&T phone records, the probable cause inquiry charges officers with knowledge of readily available wholly exculpatory facts. An officer may not "unreasonably disregard [ ] certain pieces of evidence" by "choos[ing] to ignore information that has been offered to him or her" or "elect[ing] not to obtain easily discoverable facts" that might tend to exculpate a suspect. *Kingsland v. City of Miami*, 382 F. 3d 1220, 1229, 1233 (11th Cir. 2004) (citing *Sevigny v. Dicksey*, 846 F. 2d 953 (4th Cir. 1988) ("Objective inquiry into the reasonableness of an officer's perception of the

28

critical facts leading to an arrest . . . must charge him with possession of all information reasonably discoverable by an officer acting reasonably under the circumstances.")); *see also Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994) (denying qualified immunity where a jury could find an officer received a report showing a substance was not cocaine, but then swore in a warrant the next month that the suspect possessed cocaine); *Washington v. Rivera*, 939 F.3d 1239, 1248 (11th Cir. 2019) (unlawful to "consciously ignore[] information [he] already possessed that cast significant doubt on whether a defendant was guilty" or to "possess[] information giving rise to an exculpatory inference, and d[o] nothing to examine 'easily discoverable facts' that would confirm or contradict that inference."); *Mosley v. Wade*, No. 1:19-CV-4181-CAP, 2020 WL 7051351, at *6 (N.D. Ga. Nov. 5, 2020) (denying qualified immunity in warrant case where "[t]he evidence on the record in this case establishes that the defendant did not understand the materials provided to her in response to her subpoena" and "made no effort to contact [the subpoenaed party] for assistance" and "took no steps to clarify what the files contained on the flash drive represented").

The Court may also consider the presence or absence of any exigency. If a law enforcement officer is not faced with an immediate need to make an arrest, the Eleventh Circuit has held that there is no need for "such a cursory investigation." *Daniels v. Bango*, 487 F. App'x 532, 538 (11th Cir. 2012). Instead, "[u]nder the

29

circumstances, [a law enforcement officer] could have taken a few more simple steps to verify [their] identification." *Id*. at 538–39; *see also Tillman v. Coley*, 886 F. 2d 317, 321 (11th Cir. 1989) ("This is not a case where time was of the essence in making the arrest."). That is, where "the officer 'simply did not bother to do what any police officer acting reasonably in the circumstances would have done to clarify the factual situation' and that '[t]here was no exigency which prevented his doing so,'" there could be no probable cause. *Kingsland*, 382 F. 3d at 1229. Barnett recognized there was no exigency. Barnett Dep. 86:24–25 ("[T]here was no rush, there was no deadline, there was no anything.").

Contrary to the district court's conclusion, a reasonable jury could find that Defendant Barnett knew about the 9:30pm phone call between Walton and Harry where Harry was "fine"—meaning that he had not been strangled and was not trapped in a home with a smoldering fire. That fact, combined with the facts about the Hubbards' smoke inhalation, the slow burn theory, and Plaintiff's location, eliminated Plaintiff as a person who could have possibly strangled the Hubbards and set Deborah's home on fire.

## II.   THE LEGAL PROCESS WAS CONSTITUTIONALLY INFIRM BECAUSE BARNETT FAILED TO DISCLOSE MATERIAL EXCULPATORY FACTS AND PROBABLE CAUSE WAS LACKING

This Court, led by Chief Judge William Pryor, has significantly clarified and

elaborated the contours of claims for unlawful seizures based on warrants.[10] Chief Pryor's "comprehensive" efforts, and two of his cases, were cited with approval in the Supreme Court's recent decision in *Thompson v. Clark*, 142 S. Ct. 1332 (2022). The sum of these cases, as relevant here, is that to prevail, "a plaintiff must establish (1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process." *Williams*, 965 F.3d at 1165.[11]

There are two independently sufficient ways to show invalid legal process. For one, legal process is infirm where "an official, including an individual who did not apply for the warrant, intentionally or recklessly made misstatements or

---

[10] *See Williams v. Aguirre*, 965 F.3d 1147 (11th Cir. 2020); *Laskar v. Hurd*, 972 F.3d 1278 (11th Cir. 2020); *Luke v. Gulley*, 975 F.3d 1140 (11th Cir. 2020) ("*Luke I*"); *Washington v. Howard,* 25 F.4th 891 (11th Cir. 2022); *Luke v. Gulley*, 50 F.4th 90 (11th Cir. 2022) ("*Luke II*").

[11] The second prong is not at issue because Plaintiff was detained pursuant to the warrant for fifteen months. Detention without legal process is generally limited to 48 hours because only a "brief period of detention" is lawful without some form of legal process. *Gerstein v. Pugh*, 420 U.S. 103, 113–14 (1975); *see also Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 53 (1991) (holding that detentions of more than 48 hours without a judicial determination of probable cause are presumptively unconstitutional).

Under this authority, Plaintiff's detention "could not be justified as a warrantless arrest" or without some form of legal process. *Williams*, 965 F.3d at 1167. Plaintiff's fifteen month "seizure was far too long to be justified without legal process," such that there was no alternative authority by which his seizure would have been permissible. *Id.*

omissions necessary to support the warrant." *Id*. This prong is based on *Franks v. Delaware*, 438 U.S. 154 (1978) and the case law built upon its foundation. The *Franks* standard is largely subjective, although the law recognizes both objectively and subjectively reckless conduct.[12] Under the *Franks* prong, the qualified immunity question is whether there was *actual* probable cause—not arguable probable cause—because it has long been clearly established that an officer cannot intentionally or recklessly lie to arrest someone without probable cause. *Williams*, 965 F.3d at 1169.

Alternatively, legal process is constitutionally infirm where an officer "should have known that his application failed to establish probable cause." *Id.* at 1165. This route is based on *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986), and its progeny, and reflects the well-known arguable probable cause standard.[13] The arguable probable cause standard is also the measure of whether an officer is entitled to qualified immunity. *Grider*, 618 F.3d at 1257. The "should have known" language from *Williams*, 965 F.3d at 1165, points to an objective standard,

---

[12] *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 2 (2010) ("A person acts recklessly in engaging in conduct if: (a) the person . . . *knows facts that make the risk obvious to another* in the person's situation") (emphasis added); *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1282 (11th Cir. 2010) ("objectively reckless").

[13] This Circuit has applied the arguable probable cause standard in malicious prosecution cases. *See, e.g.*, *Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010); *Rushing v. Parker*, 599 F.3d 1263, 1267 (11th Cir. 2010).

which is the Fourth Amendment's norm.[14] On Plaintiff's evidence, he prevails

under either route.

### A.    A Reasonable Jury Could Find Knowing (and Reckless) Material Omissions and Falsehoods

There is record evidence that Defendant Barnett knowingly omitted material

exculpatory facts and included false inculpatory facts. A reasonable jury could find

Defendant's conduct was intentional or at the very least went well beyond

negligence.[15] This conduct violates the clearly established law from *Franks* and its

---

[14] *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 388 (1989) (noting "the Fourth Amendment's 'objective reasonableness' standard").

[15] *See United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980) (where an officer makes misstatements so "clearly critical to a finding of probable cause . . . the fact of recklessness may be inferred from proof of the omission itself."); *Holmes v. Kucynda*, 321 F.3d 1069 (11th Cir. 2003) (where a jury could find an officer's statements used to procure a warrant were in "reckless disregard of the truth," qualified immunity was inappropriate); *Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994) (where "a reasonable police officer would have known that [their] testimony was not just negligently false, but recklessly so," qualified immunity inappropriate); *Daniels v. Bango*, 487 F. App'x 532 (11th Cir. 2012) (fact question as to recklessness where discrepancies "should have led a reasonable officer to harbor serious doubts about the conclusion that Daniels was the suspect").

Background tort law principles also support the conclusion that Defendants' conduct falls far on the side of intentional or reckless conduct, rather than mere negligence. The key distinguishing features between recklessness and negligence are (1) the relatively slight burdens involved in taking proper precaution and (2) the relatively elevated magnitude of the foreseeable risk from not taking proper precaution, which can give rise to an inference of indifference. *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 2.

progeny.

The Court's method of analysis is to "examine the materiality of the information by inquiring whether probable cause would be negated if the offending statement[s] w[ere] removed [and] the omitted information included." *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019). In making this determination, the Court is limited only to the facts contained in the warrant application, which here is the text in Doc. 101-5. Any facts that Defendant knew but did not include in the application cannot be considered. *See Williams*, 965 F.3d at 1162 ("Under this standard, 'an otherwise insufficient affidavit cannot be rehabilitated [with] information possessed by the [officer] when he sought the warrant but not disclosed to the issuing magistrate.'" (quoting *Whiteley v. Warden*, 401 U.S. 560, 568 n.8 (1971)); *see also W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982) ("[J]udicial review of the sufficiency of an affidavit for the issuance of a warrant must be strictly confined to the information brought to the magistrate's attention."). Thus, facts contained in § 4 of Plaintiff's recitation of facts, at p. 14–16, *supra*, cannot be considered.

For material omissions, Plaintiff has identified a wide range of known facts that Barnett did not disclose to the magistrate when seeking a warrant. *See* p. 5–14, *supra.* But the most significant of these facts are independently sufficient to not only undermine probable cause piece by piece, but also to conclusively prove that

Plaintiff could not have possibly committed the crimes as Barnett alleged—even if there may have been probable cause had these wholly exculpatory facts been excised from the analysis. Knowing the Hubbards were alive during the fire, that the fire somehow needed to have been set eight hours earlier, and that Plaintiff was not in the home for at least that eight-hour window before the home caught fire, is enough to seriously cast doubt on Barnett's theory of the case. None of those facts were disclosed to the magistrate.

But, most damningly, Barnett did not tell the magistrate about the call between Walton and Harry at approximately 9:30pm on July 2, which rendered Barnett's stated theory wholly impossible. Walton spoke with Harry, who was "fine," after Sylvester had supposedly strangled Harry and Deborah to an unconsciousness from which they would never recover and set Deborah's home on fire. There is no explanation for how Sylvester could have committed the crimes alleged when accounting for the Walton call. And there is no explanation for why Barnett failed to disclose this critical fact to the magistrate.

Plaintiff has also identified a host of additional material falsehoods. For many of these facts, Plaintiff presents facts that significantly undermine each of the facts that Barnett included in the warrant application. But there are a number of facts that amount to glaring false statements. As detailed above, Barnett provided false facts about Sylvester being the only one with an "opportunity[] and ability" to

commit the crimes alleged when, in fact, he had "no doubt" that Plaintiff was not in Deborah's house after 8:00pm on July 2. Barnett Dep. 91:8-18. He falsified a motive about insurance proceeds, and then tried to state that he received that information from another officer, but that officer explicitly rejected Barnett's claim. Doc. 113-2 at ¶¶ 93–117. And Barnett heavily insinuated that the materials purchased at Wal-Mart were used as accelerants to start the fire,[16] when he knew that was not the case. Doc. 113-2 at ¶¶ 150–162.

A jury could draw the inference that with each material omission and false statement, the chances of a merely innocent mistake go down and the chances of intentional conduct go up. From the sheer materiality of the facts about impossibility—the Walton call, the Hubbards being alive during the fire, the slow burn theory, knowledge of Plaintiff's location—and adding the direct evidence of intentional falsehoods about the insurance proceeds, Plaintiff submits that a jury could reasonably and readily find Barnett acted intentionally. However, it is also, of course, possible that a jury might reject Plaintiff's case and conclude that Barnett's incorrect statements were innocent or merely negligent.

---

[16] The district court noted that Barnett did not technically state that these materials were used in the fire, although their inclusion in the warrant application is only relevant if these facts are intended to be inculpatory. *See* Doc. 126 at 11 n.3.

However, resolving an individual's mental state as a matter of law is a task that can only be performed where the evidence is unambiguous. "[I]t frequently has been observed that when state of mind, or 'consciousness and conscience' is involved, credibility often will be central to the case and summary judgment inappropriate." Charles Alan Wright et al., 10B Fed. Prac. & Proc. Civ. § 2730 (4th ed.). "[A] determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable people might differ—a function traditionally left to the jury—[thus,] summary judgment often will be an inappropriate means of resolving an issue of this character." *Id.*

This Court has recognized as much:

> The court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue requires a determination of state of mind. Much depends on the credibility of the witnesses testifying as to their own states of mind. In these circumstances the jury should be given an opportunity to observe the demeanor, during direct and cross-examination, of the witnesses whose states of mind are at issue.

*Croley v. Matson Nav. Co.*, 434 F.2d 73, 77 (5th Cir. 1970) (Wisdom, J.). Here, there are sufficient facts for a jury to infer intentionality and recklessness.

Had Barnett properly included known exculpatory facts and excluded known false inculpatory statements, the warrant would have established that Plaintiff did not commit the offenses alleged. A constitutionally proper warrant would not have

read: "Keith Sylvester is the only person with motive, opportunity, and ability to

have committed this crime." Instead, the warrant would have indicated that:

> Keith Sylvester is [confirmed to lack] ~~the only person with motive,~~
> opportunity, and ability to have committed this crime. [Any other
> person's motive for this crime is unknown].

That corrected narrative excludes Plaintiff as a possible subject and properly

eliminates probable cause for the offenses charged.

### B.    Taking the Inculpatory Facts from the Warrant and the Facts Barnett Knew at the Time of the Warrant, Barnett Should Have Known His Application Failed to Establish Probable Cause

The primary difference between the *Franks* standard and the "should have

known" arguable probable cause standard from *Malley* is that Defendant is charged

with information that he did not subjectively know if a reasonable officer would

have known that information through a constitutionally reasonable investigation. In

gauging reasonableness, in circumstances like these, where there was no exigency

and serious allegations, a reasonable officer tends to be more careful and thorough.

Furthermore, where an officer is presented with a subject like Plaintiff, who is

eager to provide any information when asked, there is less reason to fail to follow

up.

There are a number of categories of facts that Defendant may claim that he

did not subjectively know at the time he applied for the warrant, but that were

"easily discoverable facts" that might tend to exculpate a suspect and are properly

part of the "'[o]bjective inquiry into the reasonableness of an officer's perception of the critical facts . . . [which] must charge him with possession of all information reasonably discoverable by an officer acting reasonably under the circumstances.'" *Kingsland v. City of Miami*, 382 F. 3d 1220, 1229, 1233 (11th Cir. 2004) (quoting *Sevigny v. Dicksey*, 846 F. 2d 953 (4th Cir. 1988).

*First*, to the extent he did not know at the time of the warrant application, Barnett should have known that the arson investigators believed there was no evidence of the kind of slow burn fire that was required to support his theory of Plaintiff's involvement in the crimes alleged. According to his investigative summary, Barnett writes that he asked arson investigator Lt. Dorgan about "a possible slow-burn fire" on May 9, 2019—after the warrant application—and that Lt. Dorgan told him "the fire was probably not started the previous evening of July 2, 2018 and was not a slow burn." Doc. 101-2 at 18. Plaintiff notes that there is disputed testimony in the record from which a jury could conclude that Barnett knew this fact *before* he obtained the warrant, and Plaintiff maintains that Barnett did know this fact but unreasonably failed to disclose it to the magistrate,[17] but in

---

[17] In his deposition, Barnett testified that he had a conversation with Dorgan "immediately prior" to taking out the warrant against Plaintiff in which Dorgan told him he doubted whether "we have enough" to get to probable cause. In that conversation, Barnett claims that Dorgan "couldn't" give him "any kind of time frame on the fire, whether it was a slow-burning fire or whether it was, you know,

any event this is information that a reasonable officer would have gathered prior to obtaining a warrant. This information shows that Barnett's theory "was probably not" correct.

*Second*, a reasonable officer confronted with a theory that the Hubbards were strangled to the point of unconsciousness but not death would know that such persons regain consciousness within seconds or minutes and that there would be no way that they would remain unconscious but breathing for eight hours. When asked about how long people would remain unconscious, Barnett's response was "I don't know." Barnett Dep. 110:9–15. But had he spoken to the medical examiner about his theory of delayed deaths, he would have known that such persons would have regained consciousness within "just a few minutes" at the most. Heninger Dep. 40:21–42:7; 71:6–72:6. The record shows that Barnett communicated with the medical examiner Dr. Heninger many times over many hours, and that Dr. Heninger was responsive to his continued questions. Barnett Dep. 202:9–12. When Dr. Heninger was asked about whether the Hubbards could have been unconscious

---

an immediate fire that would have been noticeable to neighbors and called 911 right away." Barnett Dep. 84:10–85:23.

A reasonable jury could infer that nothing would have changed in Dorgan's assessment of the nature of the fire from December 2018 to May 2019 and that Dorgan told him there was probably no "slow burn" fire as part of his skepticism that there was probable cause during this conversation immediately before the warrant application.

for eight hours, he said he thought it was "not possible." Heninger Dep. 75:19–76:4. This information was readily available, but Barnett chose to ignore it. That information would have fully eliminated probable cause. A reasonable officer would have disclosed to the magistrate that their theory was "not possible."

*Third*, Barnett should have known that the arson investigators had doubts about probable cause and the substance of those doubts. Barnett conceded that the arson investigator Dorgan had doubts about whether there was probable cause. Barnett Dep. 86:17–21 ("He said, do we have enough."). He then testified that "if he'd have said, hey, let's have a meeting, let's talk about this, slow down, I would have done it." *Id.* 86:22–24. But Dorgan says Barnett's testimony on this point was false. The asked arson investigators testified that they pleaded to meet with Defendant to discuss the case, but he blew them off. Dorgan Dep. 26:8–27:1. Dorgan also testified that he did not have enough information to believe there was probable cause for Plaintiff's arrest. Dorgan Dep. 25:19–26:1 ("I did not have, personally have the knowledge and enough information [f]or probable cause to arrest him.").

When Dorgan was confronted with four keys facts that Barnett knew—that (1) Plaintiff left the house at 8:00pm, (2) the Hubbards were alive, (3) the Hubbards remained inside the home, and (4) the Hubbards had a phone call after 8:00pm—he testified that he could think of no way Plaintiff could have committed

the crimes alleged: "Assuming those facts are true, I still can't answer that question. You're asking me to think of a way that [Plaintiff] possibly could have done that, and I can't do that." Dorgan Dep. 71:21–75:16.

Perhaps Defendant did not know that the arson investigators thought there was insufficient inculpatory information to arrest Plaintiff. But a reasonable officer would have spoken with these officials and gone over the case as they had asked prior to obtaining a warrant. Instead, Defendant blew them off and then lied about whether they tried to reach out to him.

Even assuming that some selective constellation of facts taken in isolation might amount to probable cause, here, the known and immediately knowable facts proved beyond any doubt that Plaintiff had not committed the crimes alleged. *See Cozzi v. City of Birmingham*, 892 F.3d 1288, 1294, 1297 (11th Cir. 2018) (Fourth Amendment violation to "unreasonably disregard" a "readily verifiable exculpatory fact").

## III.    TAKING PLAINTIFF'S FACTS AS TRUE, BARNETT IS NOT ENTITLED TO QUALIFIED IMMUNITY

"The essence of qualified immunity analysis is the public official's objective reasonableness, regardless of his underlying intent or motivation." *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004). The defense "does not protect 'the plainly incompetent or those who knowingly violate the law.'" *Id.* at 1231–32 (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). The critical inquiry

under this objective analysis is whether the right was clearly established. *Id.*

There are two theories under which Defendants should be denied qualified immunity. First, a jury could find that the Officers knowingly presented false evidence to obtain arrest warrants. Given the deliberate nature of the act, no additional clarity of law is needed. *See, e.g.*, *Kelly v. Curtis*, 21 F.3d 1544, 1557 (11th Cir. 1994). Second, under *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986), an officer is not protected by qualified immunity despite the fact that a magistrate issued an arrest warrant if no reasonable officer could have believed there was probable cause for the arrest. In this Circuit, that question is phrased as whether there was arguable probable cause. *See Kelly*, 21 F.3d at 1555 (discussing *Malley*, 475 U.S. at 344–45).

This approach—first analyzing whether there is a *Franks* violation, and second (and in the alternative) whether there was arguable probable cause—was used by this Circuit in *Kelly*, 21 F.3d at 1554. In *Kelly*, after first determining the defendant was not entitled to qualified immunity due to presenting false material evidence in a warrant application, the court proceeded and found that officer also violated a clearly established right by seeking an arrest warrant without sufficient evidence. *See also Carter v. Gore*, 557 F. App'x 904, 910 (11th Cir. 2014) (finding the defendant did not knowingly provide false information in violation of *Franks*, but nevertheless denying qualified immunity based on arguable probable cause).

### A.    *Barnett Violated* **Franks** *and there was no Actual Probable Cause*

In *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978), the Supreme Court held that an officer violates the Fourth Amendment by knowingly or recklessly including false material information in a search warrant application. This rule has been extended by this Circuit to arrest warrants. *See United States v. Martin*, 615 F.2d 318, 327–29 (5th Cir. 1980); *Kelly*, 21 F.3d at 1554 (denying qualified immunity to an officer who obtained an arrest warrant based on a knowingly false statement that the substance the plaintiff possessed was cocaine); *Holmes v. Kucynda*, 321 F.3d 1069, 1084 (11th Cir. 2003) ("[T]he law was clearly established in [1998] that the Constitution prohibits a police officer from knowingly making false statements in an arrest affidavit about the probable cause for an arrest.").

There are sufficient facts for a jury to reasonably conclude that Barnett made intentional and reckless misstatements and material omissions. That conduct violates clearly established law, rendering qualified immunity inapplicable. This conclusion is consistent with other constitutional torts where a high *mens rea* is inconsistent with the qualified immunity defense. *See Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1186 (11th Cir. 1994), *overruled on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n.9 (2002) ("'A finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials

who *deliberately* ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law.'").

Below, the lower court found only that there was arguable probable cause, not actual probable cause. The order adopting the report and recommendation concluded that "controlling case law is clear that Defendant is entitled to qualified immunity if he had arguable probable cause to arrest Plaintiff." Doc. 126 at 14. Because the correct standard is *actual* probable cause, summary judgment should be denied.

### B.    *Barnett Violated* **Malley** *and there was no Arguable Probable Cause*

Based on the new case of *Luke v. Gulley*, 50 F.4th 90 (11th Cir. 2022) ("*Luke II*"), which was issued after the notice of appeal below, Plaintiff maintains that arguable probable cause is insufficient to defeat a *Malley* claim. *Luke II* held that arguable probable cause did not defeat a malicious prosecution claim with extended detention. *See id.* at 92 ("The district court ruled that, even though the detective's affidavit was insufficient to provide probable cause to support the warrant to arrest Luke, the detective had at least arguable probable cause to arrest Luke. But because Luke established that the legal process underlying his seizure was constitutionally infirm and it would not have been otherwise justified, Detective Gulley does not enjoy immunity from suit.").

Alternatively, an additional basis to deny Defendant qualified immunity is to

find he proceeded with Plaintiff's prosecution with no arguable probable cause. That is, regardless of his subjective state of mind, no reasonable police officer could have believed there was probable cause to charge Plaintiff.

The arguable probable cause is objective and asks "whether 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[ ] could have believed that probable cause existed to arrest." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)). *Williams v. Aguirre* instructs that legal process is constitutionally infirm where an officer "should have known that his application failed to establish probable cause." 965 F.3d at 1165 (citing *Malley*).

A reasonable officer would have known that Barnett's theory of the case was not possible. Had Barnett disclosed to the magistrate the true facts about what happened, she would have come to the same conclusion as Dr. Heninger ("not possible" Heninger Dep. 75:19–76:4) and Lt. Dorgan ("You're asking me to think of a way that [Plaintiff] possibly could have done that, and I can't do that." Dorgan Dep. 71:21–75:16). Defendant Barnett lacked even arguable probable cause and is not entitled to qualified immunity or summary judgment.

To the extent qualified immunity would otherwise apply, Plaintiff respectfully urges that the doctrine is unlawful. *See generally* William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45 (2018) (noting that qualified

immunity is atextual and ahistorical, and arguing that qualified immunity is not justified by its claimed justifications); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797 (2018) (noting that empirical and legal rationales for qualified immunity are unjustified); *Zadeh v. Robinson*, 902 F.3d 483, 498 (Willett, J., concurring dubitante) (5th Cir. 2018) (finding that qualified immunity can sometimes resemble "unqualified impunity").

## <u>CONCLUSION</u>

The order granting summary judgment to Defendant James Barnett should be reversed, and this matter should be remanded so that a jury may resolve the disputed issues of fact.

Respectfully submitted this 22nd day of December, 2022.

**<u>Zack Greenamyre</u>**
Georgia Bar No. 293002

MITCHELL & SHAPIRO LLP
3490 Piedmont Road, Suite 650
Atlanta, Georgia 30305
Phone: 404.812.4747
zack@michtellshapiro.com

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this document complies with the 13,000-word limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,749 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface in 14-point Times New Roman font. The brief was prepared using Microsoft Word.

Submitted this 22nd day of December, 2022.

**Zack Greenamyre**
Zack Greenamyre
Georgia Bar No. 293002

MITCHELL & SHAPIRO LLP
3490 Piedmont Road, Suite 650
Atlanta, Georgia 30305
404.812.4747
zack@mitchellshapiro.com

## **CERTIFICATE OF SERVICE**

I certify that on this date I served the foregoing APPELLANT'S KEITH

SYLVESTER'S BRIEF by electronically filing with the CM/ECF system, which

constitutes service upon the following attorneys of record under 11th Cir. Doc. 25-

3(a):

Staci J. Miller
Hermise Pierre
City Of Atlanta - Law Department
55 Trinity Avenue SW, Suite 5000
Atlanta, Ga 30303

This 22nd day of December, 2022.

**Zack Greenamyre**
Zack Greenamyre
Georgia Bar No. 293002