[PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 22-13258

_____

KEITH A. SYLVESTER,

                                                      Plaintiff-Appellant,

*versus*

FULTON COUNTY JAIL,

                                                      Defendants,

APD INV. JAMES BARNETT,
#5918,
DARREN SMITH,
in their individual capacities,

                                                      Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-04300-LMM

_____

Before WILSON, JILL PRYOR, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

When a police officer intentionally lies or recklessly misleads a judge to obtain an arrest warrant, the resulting arrest violates the Fourth Amendment to the United States Constitution. Keith Sylvester says that he was the victim of such an arrest.

Sylvester's mother and stepfather were found strangled and burned to death in his mother's home. Detective James Barnett handled the murder investigation, eventually landing on Sylvester as the culprit. Detective Barnett applied for and received a warrant to arrest Sylvester, and Sylvester spent over a year in jail until the district attorney dropped the charges. In this lawsuit, Sylvester claims that Detective Barnett lacked probable cause when he applied for the arrest warrant because the evidence established that the strangulations and arson occurred around 4:00 a.m., but Detective Barnett knew that Sylvester never set foot inside his mother's home after 9:00 p.m. the night before. Because Detective Barnett's warrant affidavit omitted that exonerating evidence, Sylvester believes that Detective Barnett intentionally lied to, or at least recklessly misled, the state judge who issued the arrest warrant.

The district court granted Detective Barnett summary judgment. To the district court, the record did not establish that Detective Barnett knew about the exonerating information when he wrote the warrant affidavit. The district court concluded that, based on the totality of circumstances known to Detective Barnett at the time of the arrest, Detective Barnett's suspicion of Sylvester was reasonable.

Sylvester's appeal raises two questions. First, a legal inquiry that we resolve today: Was Detective Barnett's affidavit materially false or misleading? Second, a factual dispute: Could a reasonable jury find that any material inaccuracies resulted from intentional or reckless misconduct by Detective Barnett, or is the only explanation that Detective Barnett made some unfortunate but reasonable mistakes?

We answer both questions in Sylvester's favor. There were material facts omitted from the warrant affidavit. When those omissions are corrected, the affidavit fails to establish even arguable probable cause. As to Detective Barnett's state of mind when he authored the affidavit, a reasonable jury could find that Detective Barnett intentionally or recklessly left out information that exonerated Sylvester. And if a jury finds such misconduct, qualified immunity will not shield Detective Barnett from liability. Accordingly, we reverse the order granting Detective Barnett summary judgment and remand for additional proceedings.

## I.

Early in the morning on July 3, 2018, the Atlanta Fire Department responded to reports of a fire at the home of Deborah Hubbard. The firefighters discovered the remains of Deborah and her husband, Harry Hubbard, in the wreckage. Each body bore signs of strangulation—specifically, wires wrapped around Deborah's neck and ligature marks on Harry's neck. And fire officials could tell that the fire was intentional, having been started from multiple spots inside the home. An emergency fire response thus became a murder and arson case. The Atlanta Fire Department handled the arson investigation. Detective James Barnett of the Atlanta Police Department led the homicide investigation, with help from a medical examiner. Detective Barnett remained in contact with the arson investigators and the medical examiner throughout most of his investigation.

The majority of Detective Barnett's investigatory work occurred in the first few weeks after the fire. Over the next four months, the flow of information slowed. Eventually, Detective Barnett determined that he had gathered as much evidence as he possibly could and decided to seek an arrest warrant charging his sole suspect, Keith Sylvester—the son of Deborah and stepson of Harry.

In support of the arrest warrant application, Detective Barnett wrote an affidavit articulating a factual basis for suspecting Sylvester. As we will later explain, that affidavit is the focal point of our legal analysis. So we spend time now going through the

information Detective Barnett provided in—and, more importantly, omitted from—that affidavit.

Detective Barnett's affidavit alleges several facts that justified his suspicion of Sylvester. Sylvester was motivated to kill Deborah and Harry based on an expected home insurance policy payout. Some of Sylvester's actions the day before the fire were odd. The morning of July 2, he sent his wife, Melissa, away to visit family. That afternoon, he purchased mothballs and rubbing alcohol, which "could have been used to start the house fire and leave no trace of accelerant." Sylvester showed no signs of distress when he learned about the fire. He drove to his mother's house without speeding or committing any traffic violations. His first priority upon arriving at Deborah's home—while firefighters were still extinguishing the flames and before anyone knew of the murders—was to establish an alibi for the preceding hours. In the days and weeks following the fire, Sylvester submitted to (and even initiated) multiple interviews with Detective Barnett and other investigators, often trying to bolster his own alibi and cast suspicion on friends, family, and neighbors of Deborah and Harry. In one of those voluntary interviews, a computer voice analyzer detected deception.

But that is far from all the information the murder and arson investigations uncovered. The affidavit asserts that Sylvester said he left Deborah's house, at the latest, at 9:00 p.m. on July 2. In fact, Sylvester's movements on the night of July 2 and the morning of July 3 were captured on video—on his vehicle's dashcam and

security cameras at gambling establishments—and documented by location data from his cellphone carrier. Because of this evidence, Detective Barnett conceded in his deposition that he "had no reason to doubt [Sylvester's] location" during this period and believed that Sylvester "was where [Sylvester] said he was[.]"

The resulting timeline of events makes it exceedingly unlikely that Sylvester committed the murders. Sylvester was last inside Deborah's home no later than 9:00 p.m. on July 2. Harry's niece, Nyaira Walton, told Detective Barnett that Harry was alive, well, and on the phone with her at 9:30 p.m. that night. The forensic evidence established that the murder-arson likely began with the culprit strangling the Hubbards to a point of unconsciousness and then setting multiple small fires in the house before leaving. The forensic evidence further established that the strangulations and the arson likely took place shortly before the Atlanta Fire Department was alerted to the house fire. That call came at 3:56 a.m. on July 3—seven hours after Sylvester was last inside the home and six hours or more after Walton spoke to Harry. Thus, when Detective Barnett submitted his affidavit, a great deal of evidence tending to exonerate Sylvester had already come to light. Yet, none of that evidence was included in the affidavit.

Presented with some inculpatory evidence, and no exculpatory evidence, a state judge concluded that there was probable cause to arrest Sylvester. Sylvester was arrested and placed in pretrial detention. He launched this lawsuit while in state custody, but the district court stayed this federal civil case to see how the state

criminal prosecution played out. That case resolved with the Fulton County District Attorney's office dropping the charges against Sylvester. The district attorney's office conducted its own investigation and charged a burglar for the murders and fire. After spending more than a year in pretrial custody, Sylvester was set free in March 2020.

Upon his release from state custody, this federal lawsuit began in earnest. Sylvester sued Detective Barnett under 42 U.S.C. § 1983, alleging that Detective Barnett violated his Fourth Amendment right to be free from unreasonable seizures by causing him to be arrested and detained without probable cause. Sylvester's theory is that Detective Barnett already had in his possession all the exculpatory information discussed above when he authored the affidavit in support of the arrest warrant. The omission of that evidence was so significant, Sylvester says, that the basis for the state judge's probable cause determination was constitutionally insufficient. And, the argument goes, a jury could find that Detective Barnett either intentionally lied to the state judge or was so reckless with the truth that he misled the state judge into thinking there was probable cause.

Detective Barnett moved for summary judgment. He contended that, based on his entire investigation at the time of Sylvester's arrest, there was probable cause to suspect Sylvester. He disclaimed knowledge of most of the allegedly exonerating information on which Sylvester based his Fourth Amendment claim. Essentially, Detective Barnett's argument was that everything he did

was reasonable in light of all the facts known to him at the time. The district court agreed, concluding that the "totality of the circumstances" known to Detective Barnett in December 2018 provided probable cause and that the record contained no evidence that Detective Barnett knew or should have known about all the allegedly exonerating information. Accordingly, the district court granted summary judgment to Detective Barnett and closed the case. Sylvester timely appealed.

## II.

We review a grant of summary judgment *de novo*. *Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 711 F.3d 1264, 1270 (11th Cir. 2013). Summary judgment is proper if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)). The summary judgment record is viewed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in favor of the non-moving party. *Id.*

## III.

The Fourth Amendment prohibits "unreasonable . . . seizures." U.S. Const. amend. IV. That prohibition extends to state and municipal officials, such as Detective Barnett, through the Fourteenth Amendment's Due Process Clause. *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1548 n.4 (11th Cir. 1989). Everyone agrees that Sylvester was seized from the moment he was arrested in December 2018 until he was released in March 2020. *See Manuel*

*v. City of Joliet*, 580 U.S. 357, 359–60 (2017). So the question is whether that seizure was "reasonable." The reasonableness of the seizure is governed by our "malicious prosecution" precedents because Sylvester was arrested pursuant to a warrant. *See, e.g.*, *Land v. Sheriff of Jackson Cnty.*, 85 F.4th 1121, 1126 (11th Cir. 2023).

A Fourth Amendment malicious prosecution claim requires that (1) "the legal process justifying [the plaintiff's] seizure was constitutionally infirm," (2) the "seizure would not otherwise be justified without legal process," and (3) "the criminal proceedings against [the plaintiff] terminated in his favor." *Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020) (*"Luke I"*). Neither the second nor the third element is at issue. The duration of Sylvester's seizure—more than a year—means that valid legal process was constitutionally required. *Butler v. Smith*, 85 F.4th 1102, 1112 (11th Cir. 2023); *Luke v. Gulley*, 50 F.4th 90, 96 (11th Cir. 2022) (*"Luke II"*). And Sylvester's criminal case terminated favorably to him when the district attorney dropped the charges. *Laskar v. Hurd*, 972 F.3d 1278, 1285 (11th Cir. 2020). That leaves the constitutional infirmity of the legal process that justified Sylvester's arrest and detention.

We have held that legal process is constitutionally infirm if the officer who provided the probable cause affidavit "intentionally or recklessly made misstatements or omissions necessary to support the warrant." *Luke II*, 50 F.4th at 95–96; *see also id.* (discussing another way to establish constitutional infirmity). Capitalizing on that holding is a two-step process for a plaintiff. The plaintiff must first explain how any inaccuracies were material, *i.e.*, "necessary to

support the warrant." *Id.* If the affidavit still manages to establish probable cause for the crime charged even after correcting the defendant's purported lies, misleading statements, and omissions, then that misconduct did not cause the plaintiff any harm. Next, the plaintiff must create a triable issue as to the defendant's state of mind when authoring the affidavit. That is, there must be evidence in the record that would allow a reasonable jury to find that the inaccuracies in the affidavit did not result from a "reasonable mistake" but stemmed from intentional or reckless deception. *Williams v. Aguirre*, 965 F.3d 1147, 1165–66 (11th Cir. 2020). A plaintiff that checks both boxes also overcomes qualified immunity because we have previously held that any officer who intentionally or recklessly submits an affidavit plagued by material misstatements or omissions violates clearly established law. *Butler*, 85 F.4th at 1112 (citing *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019)).

### A.

Before addressing the facts here, we pause to emphasize that Sylvester has raised a Fourth Amendment malicious prosecution claim, not a Fourth Amendment false arrest claim. A "malicious prosecution" claim is that an officer used a constitutionally deficient legal process to effectuate an arrest—here, an allegedly defective warrant. *See, e.g.*, *Land*, 85 F.4th at 1126. A "false arrest" claim challenges as constitutionally deficient an officer's on-the-spot determination of probable cause. *See, e.g.*, *Edger v. McCabe*, 84 F.4th 1230, 1236–37 (11th Cir. 2023).

For present purposes, the most important distinction between malicious prosecution and false arrest claims is the way we look at the factual record. *See Butler*, 85 F.4th at 1113. In the false arrest context, we ask whether the totality of the circumstances known to the arresting officer at the time of the seizure provided probable cause to suspect the plaintiff of a crime. *See Williams*, 965 F.3d at 1157–58. And in that context, we do not consider evidence that the arresting officer may have harbored ill will toward the plaintiff; all that matters is whether an objectively reasonable officer could have made the same seizure under the same circumstances. *See id.* at 1158–62.

In a malicious prosecution case, however, the inquiry is about the legal process that justified the plaintiff's arrest and the defendant's role in that process. So we focus on "the affidavit charging the plaintiff." *Luke II*, 50 F.4th at 95. We ask whether the affidavit that led to the arrest warrant was materially false or misleading. And we do not care if the defendant knew about additional inculpatory evidence that was not in the affidavit. *Id.* at 96.

Even though we must focus on the facts recounted in the affidavit for purposes of assessing probable cause, the district court and Detective Barnett erroneously invoked extrinsic inculpatory evidence to bolster the case for an arrest. When moving for summary judgment, Detective Barnett pointed to evidence outside the affidavit that he believed reaffirmed his suspicion of Sylvester. The district court relied on some of that evidence when granting Detective Barnett summary judgment. But it is no response to Sylvester's

malicious prosecution claim that Detective Barnett could have, but did not, present inculpatory evidence in the affidavit that established probable cause for an arrest. Under our caselaw, Detective Barnett cannot now "rehabilitate[]" his affidavit by resorting to evidence that he never relayed to the state judge. *Id.* (citation omitted); *see also Land*, 85 F.4th at 1127. For his part, Sylvester can attack as inaccurate statements of fact that were in the affidavit and present exculpatory evidence that was omitted from the affidavit. *See Butler*, 85 F.4th at 1113.

### B.

We now turn to the two issues in this appeal: (1) whether the affidavit contained material misstatements of fact or omitted material exculpatory evidence; and, if so, (2) whether those misstatements and omissions were intentional, reckless, or merely a reasonable mistake.

### 1.

We begin with materiality. We remove from the affidavit any false or misleading inculpatory statements, insert any omitted exculpatory information, and then assess whether the corrected affidavit is still able to establish at least arguable probable cause. *See Butler*, 85 F.4th at 1113. Probable cause requires facts that allow "a person of reasonable caution to believe" that "there was a substantial chance" that Sylvester killed Deborah and Harry. *Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023) (citations omitted). Arguable probable cause exists here if "a reasonable officer" presented

22-13258               Opinion of the Court                        13

with the corrected version of Detective Barnett's affidavit could "reasonably but mistakenly conclude that probable cause is present" to suspect Sylvester. *Butler*, 85 F.4th at 1116 (cleaned up).

Sylvester takes aim at nearly every statement of fact in the warrant affidavit. To be sure, he makes a good case that many important statements in the affidavit are seriously misleading. But we need not go line by line through the affidavit. Instead, we conclude that the affidavit would not have established arguable probable cause if it had included the full timeline of the night of the murders.

That timeline starts with a fact included in the affidavit—Sylvester left Deborah's house, at the latest, at 9:00 p.m. on July 2. But the affidavit did not tell the state judge that Sylvester never reentered Deborah's home after that point. If Sylvester was the person who strangled Deborah and Harry and set fire to the house, then he must have done all of that by 9:00 p.m. on July 2. But the affidavit also omits that the Hubbards were apparently alive and well when Sylvester left the home for the last time. Detective Barnett's investigative file reflects that Harry called his niece at 9:30 p.m. on July 2 and showed no signs of distress on the call. That phone call was not in the affidavit.

There's more. Other evidence suggested that the Hubbards were not strangled and the fire was not started until nearly 4:00 a.m. on July 3—at least seven hours after Sylvester was last inside the home. The autopsies established that the Hubbards were strangled, not to death, but to a state of unconsciousness and continued breathing during the fire. That Deborah's body still had the wires

wrapped around her neck also meant that she remained unconscious during the fire. Because a strangled person typically regains consciousness within a short period of time, the autopsies established that the strangulations and the fire likely occurred within a short time of each other. Finally, the fire department's best assessment of the evidence at the scene was that the fire started shortly before it was reported at 3:56 a.m. on July 3. None of that evidence made it into the affidavit.

In response, Detective Barnett's counsel argues that, perhaps, Sylvester did not have a truly solid alibi and could have committed the crime in the early morning hours of July 3. After all, the argument goes, Sylvester's personal dashcam footage could have been fabricated or otherwise altered. But this argument is refuted by Detective Barnett himself. Detective Barnett accounted for Sylvester's location not only through Sylvester's dashcam but also through security cameras at various gambling establishments Sylvester visited and through records from Sylvester's cellphone provider. That evidence, taken together, so thoroughly corroborated Sylvester's alibi that Detective Barnett testified to having "no reason to doubt" Sylvester's location after he left the house by 9 p.m. In other words, this isn't a case in which a police officer harbored doubts about a suspect's alibi; instead, Detective Barnett concedes that Sylvester was exactly where he claimed to be when he claimed to be there.

The omission of the full timeline is material because a corrected affidavit fails to establish even arguable probable cause. If

the affidavit's omissions are corrected, then the Hubbards were alive for hours after Sylvester was inside the home for the last time. And nothing in the affidavit explains how Sylvester could have strangled the Hubbards and started a fire from inside the house shortly before 4:00 a.m. on July 3 when he never reentered Deborah's home after 9:00 p.m. on July 2. No person of reasonable caution reading a corrected version of Detective Barnett's affidavit could think there was a substantial chance that Sylvester killed the Hubbards and set fire to the house. Quite the opposite: any "reasonable law officer [with knowledge of the omitted information] would have known" that submitting the affidavit that Detective Barnett submitted "would lead to [an arrest] in violation of federal law." *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997) (quoting *Haygood v. Johnson*, 70 F.3d 92, 95 (11th Cir. 1995)).

2.

Sylvester has established that Detective Barnett's affidavit omitted material exculpatory information. Now, Sylvester must point to evidence in the record that would allow a reasonable jury to find that Detective Barnett intentionally lied to or recklessly misled the state judge. *Williams*, 965 F.3d at 1165–66. Detective Barnett's state of mind is an issue of fact that, if genuinely disputed, a jury will have to resolve. *See id.* When deciding whether there is sufficient evidence that Detective Barnett acted with a culpable state of mind, the entire summary judgment record is fair game for both sides. And because Sylvester was the party opposing summary judgment, we view the record in the light most favorable to him.

Evidence of intent could include evidence that Detective Barnett had actual knowledge of the exonerating information discussed in the preceding subsection. Actual knowledge of that information would provide a sufficient basis for a jury to conclude that the omissions of those facts were intentional. *See Butler*, 85 F.4th at 1114–17. Evidence of recklessness could include a lack of actual knowledge. If Detective Barnett failed to learn about the exonerating information, and if a reasonable jury could find that the information was easily discoverable, then a reasonable jury could find that Detective Barnett's omission of that information was due to recklessness. *See Laskar*, 972 F.3d at 1282–83, 1296 (treating failure to learn about readily available evidence as equivalent to actual knowledge of that evidence); *cf. Cozzi v. City of Birmingham*, 892 F.3d 1288, 1294 (11th Cir. 2018), *abrogation on other grounds recognized by Garcia*, 75 F.4th at 1186 n.1.

Detective Barnett's actual knowledge of some of the just-discussed exonerating information is beyond dispute. He agreed in his deposition that he "had no reason to doubt [Sylvester's] location" during the key time period, testifying that he "believe[d] [Sylvester] was where [Sylvester] said he was[.]" Detective Barnett thus knew that Sylvester never set foot back inside Deborah's home after 9:00 p.m. on July 2. And the record is clear that he knew the Hubbards were alive during the fire as it engulfed the home around 4:00 a.m. on July 3. During the autopsies just after the fire, the medical examiner "showed [him] . . . ash and soot" in the Hubbards' tracheas and explained to him that this evidence meant they were "breathing during the fire." From this actual knowledge, a

22-13258               Opinion of the Court                        17

reasonable jury could find that Detective Barnett intentionally omitted from his affidavit that there was at least a seven-hour gap between Sylvester leaving the house and the Hubbards' deaths.

The record provides more evidence that Detective Barnett intentionally or recklessly obscured the timeline in his affidavit. During his investigation, Detective Barnett understood that the gap between Sylvester leaving the home and the Hubbards' deaths in the fire was a problem for his case against Sylvester. To account for that problem, Detective Barnett theorized that Sylvester must have strangled the Hubbards and started a "slow burn" fire before leaving the house by 9:00 p.m. on July 2. According to Detective Barnett's theory, the Hubbards remained unconscious until 4:00 a.m., when the "slow burn" fire erupted, engulfed the house, and killed them.

To be clear, this "slow burn" theory is not presented in the affidavit. And it has at least two serious issues, both of which would allow a jury to find that Detective Barnett intentionally or recklessly obscured the timeline when he wrote his affidavit.

The first problem with the "slow burn" theory is that it doesn't account for the 9:30 p.m. phone call between Harry and Harry's niece on July 2. If Sylvester had set the "slow burn" fire before he left the house by 9:00 p.m., then he would also have strangled Harry before he left. If Harry was alive, on the phone, and showing no signs of distress, then Detective Barnett's theory is impossible. There is no genuine dispute that Detective Barnett knew about the Harry-Walton phone call. In the summary

judgment record, there is a recorded phone call between Detective Barnett and Walton. During that call, Walton informs Detective Barnett about her July 2 call with Harry. Detective Barnett then asks multiple follow-up questions about the call, including to confirm the time it took place. A reasonable jury could thus find that Detective Barnett intentionally omitted the phone call from the affidavit because it proved, contrary to his theory, that the Hubbards were unharmed after Sylvester was last inside the home.

The second problem with the "slow burn" theory is that a reasonable jury could find it to be incompatible with the forensic evidence available to Detective Barnett at the time he submitted his affidavit. The medical examiner testified that someone strangled to a state of unconsciousness like the Hubbards would remain unconscious for, most likely, a matter of minutes, and the fire captain testified that the fire almost certainly engulfed the house within a short time of being lit. Their testimonies make clear that, if Detective Barnett had disclosed his "slow burn" theory to either of them, they would have told him that his theory was inconsistent with the evidence. But Detective Barnett did not seek their views before submitting the warrant affidavit. Instead, months after the arrest, Detective Barrett asked a fire investigator about his "slow burn" theory, and that investigator told Detective Barnett that the fire was not a "slow burn" fire.

Finally, in addition to these problems with the "slow burn" theory, the affidavit has other arguably inaccurate or misleading statements that provide grounds for a reasonable jury to find that

Detective Barnett was either less than forthright or less than careful when authoring his affidavit. For example, Detective Barnett stated in his affidavit that "[a]rson investigators believe the [m]othballs and alcohol" Sylvester bought the day before "could have been used to start the house fire and leave no trace of accelerant." But a reasonable jury could conclude that information in Detective Barnett's investigative file proved that the mothballs were not used to start the fire—the mothballs were discovered, in unopened boxes, on Deborah's kitchen counter after the fire. Likewise, a reasonable jury could find that the arson investigators never said that alcohol is untraceable and that the arson investigators, in fact, tested for alcohol as a possible accelerant and did not find it.

Sylvester has carried his burden. To be clear, on this record, we do not know who murdered the Hubbards or whether Sylvester was involved in some way. We answer only the question before us and hold that a reasonable jury could find that Detective Barnett recklessly or intentionally wrote his affidavit in a way that misled the state judge into thinking there was probable cause to arrest Sylvester.

### IV.

The judgment of the district court is **REVERSED**, and this case is **REMANDED** for further proceedings.